UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE STATE OF TEXAS;                                    )
THE STATE OF CONNECTICUT;                              )
THE STATE OF OHIO;                                     )
THE STATE OF ALABAMA;                                  )
THE STATE OF ALASKA;                                   )
THE TERRITORY OF AMERICAN SAMOA;                       ) 12 CIV 6625
THE STATE OF ARIZONA;                                  )
THE STATE OF ARKANSAS;                                 )
THE STATE OF CALIFORNIA;                               )
THE STATE OF COLORADO;                                 )
THE STATE OF DELAWARE;                                 )
THE DISTRICT OF COLUMBIA;                              )
THE STATE OF FLORIDA;                                  )
THE STATE OF GEORGIA;                                  )
THE TERRITORY OF GUAM;                                 )
THE STATE OF HAWAII;                                   )
THE STATE OF IDAHO;                                    )
THE STATE OF ILLINOIS;                                 )
THE STATE OF INDIANA;                                  )
THE STATE OF IOWA;                                     )
THE STATE OF KANSAS;                                   )
THE COMMONWEALTH OF KENTUCKY;                          )
THE STATE OF LOUISIANA;                                )
THE STATE OF MAINE;                                    )
THE STATE OF MARYLAND;                                 )
THE COMMONWEALTH OF MASSACHUSETTS;                     )
THE STATE OF MICHIGAN;                                 )
THE STATE OF MISSISSIPPI;                              )
THE STATE OF MISSOURI;                                 )
THE STATE OF MONTANA;                                  )
THE STATE OF NEBRASKA;                                 )
THE STATE OF NEVADA;                                   )
THE STATE OF NEW HAMPSHIRE;                            )
THE STATE OF NEW JERSEY;                               )
THE STATE OF NEW MEXICO;                               )
THE STATE OF NEW YORK;                                 )
THE STATE OF NORTH CAROLINA;                           )
THE STATE OF NORTH DAKOTA;                             )
THE COMMONWEALTH OF THE NORTHERN                       )
MARIANA ISLANDS;                                       )
THE STATE OF OKLAHOMA;                                 )
THE STATE OF OREGON;                                   )
THE COMMONWEALTH OF PENNSYLVANIA;                      )

1

| | |
|---|---|
| **THE COMMONWEALTH OF PUERTO RICO;** | ) |
| **THE STATE OF RHODE ISLAND;** | ) |
| **THE STATE OF SOUTH CAROLINA;** | ) |
| **THE STATE OF SOUTH DAKOTA;** | ) |
| **THE STATE OF TENNESSEE;** | ) |
| **THE STATE OF UTAH;** | ) |
| **THE STATE OF VERMONT;** | ) |
| **THE COMMONWEALTH OF VIRGINIA;** | ) |
| **THE TERRITORY OF THE VIRGIN ISLANDS;** | ) |
| **THE STATE OF WASHINGTON;** | ) |
| **THE STATE OF WEST VIRGINIA;** | ) |
| **THE STATE OF WISCONSIN;** | ) |
| **THE STATE OF WYOMING** | ) Civil Action No. |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| | ) |
| | ) |
| **HACHETTE BOOK GROUP, INC.;** | ) |
| **HARPERCOLLINS PUBLISHERS, LLC.;** | ) |
| **SIMON & SCHUSTER, INC.; and** | ) |
| **SIMON & SCHUSTER DIGITAL SALES, INC.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## COMPLAINT

The above-captioned States, Commonwealths, Territories and Possessions (the "Plaintiff States"), by and through their Attorneys General, bring this action in their sovereign capacity against Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers, LLC ("HarperCollins"), Simon & Schuster, Inc. and Simon & Schuster Digital Sales, Inc. ("the Defendants") for injunctive relief and for damages as *parens patriae* on behalf of natural persons who purchased E-books from Defendants and other co-conspirators known to the Plaintiff States and allege as follows:

2

## I. SUMMARY OF COMPLAINT

1.      As a result of facts learned during a non-public investigation begun by the States of Texas and Connecticut in 2010, the Plaintiff States charge the Defendants with entering into contracts, combinations, and conspiracies that restrain trade.

2.      Specifically, by the end of summer 2009 at the latest, the Defendants, together with other co-conspirators known to the Plaintiff States, entered into an agreement to raise the retail price of electronic books ("E-books"). In furtherance of this conspiracy, by mid-December 2009, the Defendants and other co-conspirators known to the Plaintiff States agreed to delay publication of certain frontlist E-books for several months following each book's first printed release. In the publishing industry, this practice is known as "Windowing." The Defendants and others viewed this collective Windowing as providing them with enhanced bargaining power with which they could negotiate higher retail prices from Amazon and other distribution outlets ("E-book Outlets or Outlets").

3.      No later than January 2010, seizing an opportunity that arose in connection with the entry of Apple, Inc. ("Apple") into the E-book market, the Defendants and other co-conspirators known to the Plaintiff States conspired and agreed to increase retail E-book prices for all consumers. The conspirators' plan had two components. First, the Defendants and other co-conspirators known to the Plaintiff States would shift their market-wide distribution model for E-books from a distribution model under which E-book Outlets such as Amazon or Barnes & Noble would set retail E-book prices and sell E-books directly to consumers (the "Wholesale-Retail Model") to a model in which publishers would set retail E-book prices and sell E-books directly to consumers (the "Agency Model"). Second, the Defendants and other co-conspirators known to the Plaintiff States would then raise E-book retail prices.

3

4.     As a result of their conspiracy, the Defendants and other co-conspirators known to the Plaintiff States agreed to eliminate E-book retail price competition between E-book Outlets, such that retail prices to consumers would be the same regardless of the Outlet patronized by the consumer. The Defendants and other co-conspirators known to the Plaintiff States increased E-book retail prices pursuant to this illegal agreement beginning on April 1, 2010.

5.     As a result of the conspiracy, consumers nationwide, in aggregate, paid millions of dollars in overcharges on E-books.

## II. JURISDICTION AND VENUE

6.     The Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4c and 16 of the Clayton Act, 15 U.S.C. §§ 15c and 26, and under 28 U.S.C. §§ 1331 and 1337. This case is related to MDL litigation currently pending before this Court captioned *The State of Texas et al. v. Penguin Group (USA) Inc., et al.*, (*In Re Electronic Books Antitrust Litigation*), 1:12-CV-03394 (DLC).

7.     This Court may exercise personal jurisdiction over the Defendants because they have principal places of business within the Southern District of New York and sell E-books to consumers residing in the Southern District of New York.

8.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(c). The Defendants may be found and transact business within the Southern District of New York.

## III. THE PARTIES

9.     The Attorneys General of the Plaintiff States are the chief legal officers for their respective states and commonwealths. They are granted authority under federal antitrust law to bring actions for injunctive relief and as *parens patriae* on behalf of consumers, and under the laws of their respective states to bring actions to ensure compliance with their state laws and to

4

enjoin violations of state law.

10.     Defendant Hachette Book Group, Inc. is a Delaware corporation with its principal place of business at 237 Park Avenue, New York, NY 10017.

11.     Defendant HarperCollins Publishers LLC is a Delaware limited liability company with its principal place of business at 10 East 53rd Street, New York, NY 10022.

12.     Defendant Simon & Schuster, Inc. is a New York corporation with its principal place of business at 1230 Avenue of the Americas, New York, New York, 10020.  Defendant Simon & Schuster Digital Sales, Inc. is a Delaware corporation and a wholly-owned subsidiary of Simon & Schuster, Inc., with its principal place of business at the same address as its parent. For purposes of the Complaint, Simon & Schuster, Inc. and Simon & Schuster Digital Sales, Inc. are referred to collectively as "Simon & Schuster."

## IV. FACTS SUPPORTING THE LEGAL CLAIMS

### A.     Book Sales: An Overview

13.     Publishers work with authors to bring books to market in a variety of printed and other formats, including hardcover, trade paperback and mass market paperback.

14.     The American publishing industry is dominated by six Manhattan-based publishers:  Hachette, HarperCollins, Simon & Schuster, Penguin Group, Holtzbrinck Publishers LLC, (which does business as Macmillan) and Random House, Inc. (the "Big Six").  For decades, the Big Six or their predecessors have served as authors' primary intermediaries to secure widespread retail print distribution and marketing.

15.     Publishers generally sell printed books to retailers on a Wholesale-Retail Model. In the Wholesale-Retail Model, publishers set a list price for the printed book and a discount percentage from the list price for a particular Outlet.  The list price minus the amount discounted is the wholesale price of the printed book.  For example, a hardcover book with a list price of

5

$30.00 that has a discount off list of 50% has a wholesale price of $15.00.

16.     Once the books are received by the Outlets, the Outlets place printed books into their inventories for storage, set retail prices for these books, and sell them directly to consumers.

17.     Publishers divide their catalogues between frontlist and backlist titles. Frontlist titles refer to the publishers' most recently released titles. Depending on the publisher, it usually refers to titles released within the past seven months to the past year. Backlist titles comprise the remainder of the publishers' catalogues.

18.     E-books are electronic versions of books. Generally, the Big Six provide a printed edition of a title simultaneously with the E-book. Consumers can read E-books on a variety of electronic devices, including cellular phones, personal computers, tablet computers, and devices dedicated solely to reading E-books.

19.     Despite their availability for approximately two decades, E-books have only recently become a commercially-viable mainstream market. Between 2007 and 2011, E-books' share of all titles sold in the United States grew from under 2% to approximately 25%. In 2010, approximately 114 million E-books were sold, and E-book sales hit $441.3 million.

20.     Historically, as with printed book distribution, an E-book Outlet would pay the publisher a wholesale price for each E-book sold. The wholesale price was calculated by subtracting a discounted amount from the digital list price. For example, if an E-book had a digital list price of $26.00 and a discount of 50%, the wholesale price was $13.00. The Outlet, functioning as a retailer, would then set the retail price of the E-book.

21.     By 2009, Amazon accounted for the vast majority of the publishers' E-book sales. In the fall of 2007, shortly after releasing the Kindle, Amazon publicly committed to sell New York Times ("NYT") bestseller E-books to consumers for $9.99, a retail price point popular with consumers. This low price point helped make it attractive for consumers to switch from

6

purchasing print books to purchasing E-books.

22.     As the leading E-book retailer, Amazon's $9.99 pricing policy for NYT bestseller E-books stoked intense competition among E-book retailers as its rivals priced at or near Amazon's price point to remain competitive. As a result, prior to January 2010, consumers could generally purchase NYT bestseller E-books for $9.99 contemporaneously with hardcover releases.

**B.      The Defendants and Co-conspirators known to the Plaintiff States Agree that NYT Bestseller E-book Prices Must Rise from $9.99**

23.     Amazon's low retail pricing and leading position among E-book retailers gave rise to serious concerns for the Defendants and co-conspirators known to the Plaintiff States. First, the Defendants and co-conspirators known to the Plaintiff States feared that, as E-books sales grew larger in the future, Amazon would utilize its significant bargaining clout as the leading E-book retailer to seek lower wholesale E-book prices.

24.     In a robust E-books market, E-book only publishers could compete without relying on the long-established distribution systems. E-book only publishers could enhance consumer choice, meet consumer demand, and provide innovative distribution. Because of this, the Defendants and other co-conspirators known to the Plaintiff States also feared that Amazon would emerge as a direct competitor by contracting directly with authors to publish its own E-books.

25.     The Defendants and other co-conspirators known to the Plaintiff States were concerned that increased sales of E-books would reduce sales of higher-priced printed editions of the same books.

26.     Because of these concerns, the Defendants and other co-conspirators known to the Plaintiff States, individually and collectively, began searching for a path to higher prices for

NYT bestseller -E-books.

27.     Starting no later than summer 2008 and continuing throughout 2009 on a regular basis, CEOs representing the Big Six began having regular meetings to discuss sensitive business matters, including concerns related to E-books and Amazon.  No antitrust counsel attended any of the meetings.

28.     Beginning in early 2009, some of the Defendants and other co-conspirators known to the Plaintiff States considered, but did not adopt, alternative distribution models to restrain retailers from discounting the price for sales of their E-book titles, including resale price maintenance and minimum advertised price.  None of the publishers were ultimately willing to adopt such strategies unilaterally, because of the substantial risks to individual publishers of acting alone.

29.     By the summer of 2009, it was clear to all of the Defendants and other co-conspirators known to the Plaintiff States that only by working together could they successfully force Amazon and other E-book retailers to raise their prices for NYT bestsellers.  In the absence of such collective bargaining power, Amazon could retaliate against individual publishers by delisting their E-books and print books from its website.  And if the Defendants and other co-conspirators known to the Plaintiff States failed to implement their new pricing structure contemporaneously, each publisher would lose sales to lower-priced E-books because the retail prices of its books would rise too high relative to the retail prices of the others.

30.     On information and belief, by no later than the end of summer 2009, the Defendants and other co-conspirators known to the Plaintiff States reached an agreement that something had to be done to end Amazon's $9.99 pricing of NYT bestsellers, and they were collectively searching for the means to effectuate a price increase.

C.     **Windowing: The First Collective Attempt to Raise Prices**

31.     In 2009, certain E-book publishers shared information among one another about which titles they would Window and their anticipated delay period for E-book publication.  In the fall 2009, the Defendants began experimenting with Windowing certain frontlist E-books. And, by early December 2009, the Defendants agreed to Window a broad number of titles as a means of gaining bargaining leverage over Amazon.  By December 15, 2009, an additional conspirator publisher agreed to join the Defendants in Windowing certain frontlist titles.

32.     Windowing unilaterally would have been against each publisher's economic self-interest, because it would introduce substantial economic risks.  But by agreeing to act together, these risks were substantially reduced.

33.     The Defendants and another co-conspirator known to the Plaintiff States broadly Windowed E-book titles roughly from December 26, 2009 through April 1, 2010.  The delay in publication constituted an illegal restriction on output to the detriment of consumers.

34.     As set forth below, the agreement among the Defendants and other co-conspirators known to the Plaintiff States to raise prices via the Agency Model made Windowing unnecessary.

D.     **The Defendants and Other Co-conspirators Known to the Plaintiff States Agree to Raise E-book Prices Using the Agency Model**

35.     In mid-December 2009, Apple approached the Big Six about becoming an E-book Outlet.  Apple planned to release its iPad tablet computer in early 2010 and wanted to supply E-books to iPad customers in its iBookstore.

36.     The entry of Apple into the E-book market provided the Defendants and other co-conspirator publishers known to Plaintiff States with a better means of implementing their agreement to force up retail prices.  Specifically, the Defendants and other co-conspirators

9

known to the Plaintiff States saw the opportunity to employ a distribution strategy known as the "Agency Model." Under the Agency Model, a publisher would be the direct seller of E-books to consumers, setting the retail price for each E-book sold. Under that model, the Outlet would act as an agent to facilitate the sale and would receive a commission on each E-book sold through the Outlet.

37.     In January 2010, the Defendants and other co-conspirators known to the Plaintiff States collectively agreed to enter into materially identical Agency Contracts with Apple, which enabled the Defendants and other co-conspirators known to the Plaintiff States to establish the retail price of books sold through the Apple iBookstore. Each of the Agency Contracts contained what is colloquially known as a "most favored nation" clause (an "MFN"). The MFNs provided that if a co-conspirator publisher allowed any other retailer to sell an E-book for a lower price than the price set for Apple customers, it must also afford that price to Apple customers.

38.     The ineluctable result of the MFN was to require that any publisher who was a party to the MFN convert all of its retailers to the Agency Model, so that none of them (especially Amazon) would be able to discount retail prices below those specified in the Apple Agency Contracts.

39.     A move by a single publisher to convert all of its Outlets to the Agency Model would have been against that publisher's unilateral self-interest. Any single publisher would have faced potential retaliation from Amazon. And, even if a single publisher succeeded in adopting the Agency Model, it would not be able to raise prices without concern that consumers would turn to other publishers' E-books that the Outlets priced lower under a Wholesale-Retail Model. The Defendants and other co-conspirators known to the Plaintiff States would not have agreed to the adoption of the Agency Model to raise prices but for the assurances that a sufficient number of the other publishers would participate.

40.     Each of the Agency Contracts also contained an Exhibit A, which was focused on customer pricing. Exhibit A provided an agreed-upon breakdown of what prices should be offered to U.S. purchasers for all of the Defendants and other co-conspirators known to the Plaintiff States' frontlist titles, including specifically NYT bestsellers. Through their conversations with the conspirators, the Defendants and other co-conspirators known to the Plaintiff States knew that they were all entering into Agency Contracts with materially identical terms, including identical price bands, and that collectively, they would be able to raise retail E-book prices to the levels specified in the price bands.

41.     As the date for the iPad launch approached in January 2010, the communications among and between the Defendants and other co-conspirators known to the Plaintiff States intensified. By January 27, 2010, the Defendants and other co-conspirators known to the Plaintiff States had, through a series of communications among and between executives at the highest levels of the companies who were parties to the contracts, agreed to the Agency Model.

42.     Between January 27, 2010 and April 1, 2010, the Defendants and other co-conspirators known to the Plaintiff States converted the largest Outlets, including Amazon, to the Agency Model. Starting in April 2010 and pursuant to their illegal agreement, the Defendants and other co-conspirators known to the Plaintiff States generally raised retail prices of NYT bestseller E-books from $9.99 to the $12.99 - $14.99 level. Contemporaneously, the Defendants and other co-conspirators known to the Plaintiff States also, on average, raised retail E-book prices across frontlist and backlist books.

**E. The Defendants and Others Known to the Plaintiff States Police and Enforce Their Agreement**

43.    Over the next four months, the Defendants and other co-conspirators known to the Plaintiff States took steps to ensure that the anticompetitive agreement was implemented, providing necessary material support and encouragement to a co-conspirator known to the Plaintiff States, in its ultimately successful negotiations with Amazon.  Subsequent to their own shift to the Agency Model, the Defendants and other co-conspirators known to the Plaintiff States also worked together to pressure non-conspirator Random House to move to the Agency Model, as it ultimately did.

44.    As a result of their illegal agreement, the Defendants and other co-conspirators known to the Plaintiff States restricted output of E-books by charging consumers artificially high retail prices.  As a result, consumers have suffered millions of dollars in overcharges nationwide.

45.    The Defendants withdrew from the conspiracy by no later than May 21, 2012, the time at which the actions taken pursuant to the Proposed Final Judgment entered into with the United States Department of Justice on April 11, 2012,  relating to the conduct alleged in this Complaint, became effective.

## V. RELEVANT MARKETS

46.    The relevant product market is the market for the sale of E-books.  Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster are competitors in this product market.

47.    The relevant geographic market is the United States.  Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster are competitors in this geographic market.

12

## VI. TRADE & COMMERCE

48.    The activities of the Defendants and other co-conspirators known to the Plaintiff

States, including the production, sale and distribution of E-books, were in the regular, continuous

and substantial flow of interstate trade and commerce and have had, and continue to have, a

substantial effect upon interstate commerce.  The activities of the Defendants and other co-

conspirators known to the Plaintiff States also had, and continue to have, a substantial effect

upon the trade and commerce within each of the Plaintiff States.

## VII. MARKET EFFECTS

49.    The acts and practices of the Defendants and other co-conspirators known to the

Plaintiff States have had the purpose or effect, or the tendency or capacity, of restraining

competition unreasonably and injuring competition by preventing the competitive retail pricing

of E-books, and have directly resulted in an increase in retail E-book prices across both the

frontlist and backlist titles of the Defendants and other co-conspirator publishers known to the

Plaintiff States.

50.    By preventing the competitive retail pricing of E-books, Defendants and other co-

conspirators known to the Plaintiff States have deprived the Plaintiff States and their consumers

of the benefits of the competition that the federal and state antitrust laws, consumer protection

laws and/or unfair competition statutes and related state laws are designed to promote, preserve,

and protect.

## COUNT I
## HORIZONTAL CONSPIRACY TO RAISE E-BOOK RETAIL PRICES
## IN VIOLATION OF SECTION I OF THE SHERMAN ACT

51.    Plaintiff States repeat and reallege every preceding allegation as if fully set forth

herein.

52.    By no later than the end of summer 2009, Defendants and others known  to the

13

Plaintiff States entered into an agreement to work together to raise the NYT bestseller E-book retail prices from the $9.99 price point.

53.     This agreement among and between horizontal competitors and others known to the Plaintiff States to raise E-book prices constitutes a per se violation of Section 1 of the Sherman Act.

54.     In the alternative, the agreement between and among the Defendants and other co-conspirators known to the Plaintiff States caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist. For this reason, under a rule of reason analysis, the agreement is a violation of Section 1 of the Sherman Act.

**COUNT II**
**HORIZONTAL CONSPIRACY TO RAISE E-BOOK RETAIL PRICES USING**
**WINDOWING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

55.     Plaintiff States repeat and reallege every preceding allegation as if fully set forth herein.

56.     In December 2009, Defendants and other co-conspirators known to the Plaintiff States entered into an agreement to Window their frontlist E-books. The goal of this agreement was to restrict frontlist E-book output in an attempt to cause retail E-book Outlets to raise frontlist E-book prices. For this reason, the agreement among and between horizontal competitors to raise E-book prices constitutes a per se violation of Section 1 of the Sherman Act.

57.     In the alternative, the agreement to Window among Defendants and other co-conspirators known to the Plaintiff States caused anticompetitive effects that substantially outweigh any procompetitive justifications, if any exist. For this reason, under a rule of reason analysis, the agreement is a violation of Section 1 of the Sherman Act.

14

## COUNT III
## HORIZONTAL CONSPIRACY TO RAISE E-BOOK RETAIL PRICES
## USING THE AGENCY MODEL IN VIOLATION OF THE SHERMAN ACT

58.     Plaintiff States repeat and reallege every preceding allegation as if fully set forth herein.

59.     By no later than the end of January 2010, Defendants and other co-conspirators known to the Plaintiff States entered into a horizontal agreement to use the Agency Model as a mechanism to raise the retail prices for frontlist E-books.  This agreement to raise E-book prices among and between horizontal competitors and others known to the Plaintiff States constitutes a per se violation of Section 1 of the Sherman Act.

60.     In the alternative, the purpose and effect of the agreement between and among the Defendants and others known to the Plaintiff States to use the Agency Model to raise E-book prices was to restrain competition between and among publishers in the market for direct E-book retail sales to consumers.  The agreement has caused anticompetitive effects that substantially outweigh procompetitive justifications, if any exist.  For this reason, under a rule of reason analysis, the agreement is a violation of Section 1 of the Sherman Act.

### PRAYER FOR RELIEF

Accordingly, the Plaintiff States request that the Court:

1.     Adjudge and decree that the Defendants have committed violations of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.     Enjoin and restrain, pursuant to federal law, the Defendants, their affiliates, assignees, subsidiaries, successors and transferees, and their officers, directors, partners, agents, and employees, and all persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct (including the conspiracies described herein) and from adopting in the future any practice, plan, program or device having a similar purpose or effect to the anticompetitive actions set forth above; and

3.     Award treble damages for injury to natural persons under Section 4c of the Clayton Act;

15

4.   Award the Plaintiff States the costs of this action, including reasonable attorneys' fees and costs, as provided in Section 4c of the Clayton Act;  and

5.   Direct such other and further relief as the Court deems just and proper.


Dated: August 29, 2012                      Respectfully submitted:


STATE OF TEXAS
GREG ABBOTT, ATTORNEY GENERAL

DANIEL HODGE
First Assistant Attorney General
JOHN B. SCOTT
Deputy Attorney General for Civil
Litigation
JOHN T. PRUD'HOMME
Chief, Consumer Protection Division
KIM VAN WINKLE
Section Chief, Antitrust Section
Consumer Protection Division
GABRIEL R GERVEY
Assistant Attorney General

BY: _Rebecca Fisher (RLH)_
Rebecca Fisher
Senior Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone (512) 463-1265
Rebecca.Fisher@texasattorneygeneral.gov

**ATTORNEYS FOR THE STATE OF TEXAS
LIAISON COUNSEL FOR PLAINTIFF STATES**

STATE OF CONNECTICUT
GEORGE JEPSEN, ATTORNEY GENERAL

MICHAEL E. COLE
Chief, Antitrust Department

W. Joseph Nielsen

BY: _Gary Becker (RH)_

Gary M. Becker (GB8259)
Assistant Attorneys General
55 Elm Street
Hartford, CT 06106
PH: (860) 808-5040
Michael.Cole@ct.gov
Joseph.Nielsen@ct.gov
Gary.Becker@ct.gov

**ATTORNEYS FOR THE STATE OF
CONNECTICUT
LIAISON COUNSEL FOR PLAINTIFF STATES**

STATE OF OHIO
R. MICHAEL DEWINE,
ATTORNEY GENERAL

BY _Doreen Johnson (RH)_

DOREEN JOHNSON
Assistant Chief, Antitrust Section

Edward J. Olszewski
Assistant Attorney General
Office of the Ohio Attorney General,
Antitrust Section
150 E. Gay St. – 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Doreen.Johnson@ohioattorneygeneral.gov

**ATTORNEYS FOR THE STATE OF OHIO
LIAISON COUNSEL FOR PLAINTIFF STATES**

17

STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

BY: _____
Robert L. Hubbard (RH3821)
Linda J. Gargiulo (LG4315)
Assistant Attorney General
Antitrust Bureau
120 Broadway, 26th Floor
New York, NY 10271-0332
(212) 416-8274
robert.hubbard@ag.ny.gov
linda.gargiulo@ag.ny.gov

**ATTORNEYS FOR THE STATE OF NEW YORK**
**LOCAL COUNSEL**

STATE OF ALABAMA
LUTHER STRANGE
ATTORNEY GENERAL

Billington M. Garrett
Assistant Attorney General
State of Alabama
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7555

**ATTORNEYS FOR THE STATE OF ALABAMA**

STATE OF ALASKA
MICHAEL C. GERAGHTY
ATTORNEY GENERAL

Clyde E. Sniffen, Jr.
Sr. Assistant Attorney General
Alaska Department of Law
1031 W. 4th Ave., #200
Anchorage, AK  99501
(907) 269-5200

**ATTORNEYS FOR THE STATE OF ALASKA**

18

TERRITORY OF AMERICAN SAMOA
FEPULEA'I A. "AFA" RIPLEY, JR.

Mitzie Jessop Folau
Deputy Attorney General

**ATTORNEYS FOR THE TERRITORY OF
AMERICAN SAMOA**

STATE OF ARIZONA
THOMAS C. HORNE
ATTORNEY GENERAL

Nancy M. Bonnell
Antitrust Unit Chief
1275 West Washington
Phoenix, AZ   85007
(602) 542-7728

**ATTORNEYS FOR THE STATE OF ARIZONA**

STATE OF ARKANSAS
DUSTIN McDANIEL
ATTORNEY GENERAL

Kevin Wells
Assistant Attorney General
Consumer Protection Division
Arkansas Attorney General's Office
323 Center Street, Suite 500
Little Rock, AR 72201
(501) 682-8063

**ATTORNEYS FOR THE STATE OF ARKANSAS**

STATE OF CALIFORNIA
KAMALA D. HARRIS
ATTORNEY GENERAL

Paula Lauren Gibson
Deputy Attorney General
300 S. Spring Street, Suite 1720
Los Angeles, CA 90013
(213) 897-0014

**ATTORNEYS FOR THE STATE OF**

**CALIFORNIA**
STATE OF COLORADO
JOHN W. SUTHERS
ATTORNEY GENERAL

Devin Laiho
Assistant Attorney General
1525 Sherman St., 7th Floor
Denver, CO 80203
(303) 866-5079

**ATTORNEYS FOR THE STATE OF COLORADO**

STATE OF DELAWARE
BEAU BIDEN
ATTORNEY GENERAL

Michael Undorf
Deputy Attorney General
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801
(302) 577-8924

**ATTORNEYS FOR THE STATE OF DELAWARE**

DISTRICT OF COLUMBIA
IRVIN B. NATHAN
ATTORNEY GENERAL

ELLEN S. EFROS
DEPUTY ATTORNEY GENERAL,
PUBLIC INTEREST DIVISION

Bennett Rushkoff
Chief, Public Advocacy Section

Catherine A. Jackson
Assistant Attorney General
441 Fourth St., N.W., Suite 600-S
Washington, DC 20001
(202) 442-9864

**ATTORNEYS FOR THE DISTRICT OF COLUMBIA**

STATE OF FLORIDA
PAMELA JO BONDI
ATTORNEY GENERAL

Lizabeth A. Brady
Chief of Multistate Antitrust Enforcement
Office of the Attorney General of Florida
The Capitol, PL-01
Tallahassee, FL 32399-1050
(850) 414-3851

**ATTORNEYS FOR THE STATE OF FLORIDA**

STATE OF GEORGIA
SAMUELS S. OLENS
ATTORNEY GENERAL

Daniel S. Walsh
Senior Assistant Attorney General
40 Capitol Square, SW
Atlanta, GA 30331-1300
(404) 657-2204

**ATTORNEYS FOR THE STATE OF GEORGIA**

TERRITORY OF GUAM
LEONARDO M. RAPADAS
ATTORNEY GENERAL

287 West O'Brien Drive
Hagatna, GU 96910
(671) 475-3324

**ATTORNEY FOR THE TERRITORY OF GUAM**

STATE OF HAWAII
DAVID M. LOUIE
ATTORNEY GENERAL

Rodney I. Kimura
Deputy Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1180

**ATTORNEYS FOR THE STATE OF HAWAII**

21

STATE OF IDAHO
LAWRENCE G. WASDEN
ATTORNEY GENERAL

Brett T. DeLange
Deputy Attorney General
954 W. Jefferson, 2nd Floor
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-4114

**ATTORNEY FOR THE STATE OF IDAHO**

STATE OF ILLINOIS
LISA MADIGAN
ATTORNEY GENERAL

Chadwick O. Brooker
Assistant Attorney General
James R. Thompson Center
100 W Randolph Street
Chicago, IL 60601
(312) 793-3891

**ATTORNEYS FOR THE STATE OF ILLINOIS**

STATE OF INDIANA
GREGORY F. ZOELLER
ATTORNEY GENERAL

Jeremy R. Comeau
Deputy Attorney General
302 West Washington St., 5th Floor
Indianapolis, IN 46204
(317) 232-6317

**ATTORNEYS FOR THE STATE OF INDIANA**

STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL

Layne M. Lindebak
Assistant Attorney General
Special Litigation Division
Iowa Department of Justice

22

Hoover Office Building, Second Floor
1305 East Walnut St.
Des Moines, IA 50319
(515) 281-7054

**ATTORNEYS FOR THE STATE OF IOWA**

STATE OF KANSAS
DEREK SCHMIDT
ATTORNEY GENERAL

Lynette R. Bakker
Assistant Attorney General
120 SW Tenth Ave., 2nd Floor
Topeka, KS 66612-1597
(785) 368-8451

**ATTORNEYS FOR THE STATE OF KANSAS**

COMMONWEALTH OF KENTUCKY
JACK CONWAY
ATTORNEY GENERAL

C. Terrell Miller
Assistant Attorney General
Consumer Protection Division
1024 Capital Center Dr., Suite 200
Frankfort, KY 40601
(502) 696-5389

**ATTORNEYS FOR THE COMMONWEALTH OF
KENTUCKY**

STATE OF LOUISANA
JAMES D. "BUDDY" CALDWELL
ATTORNEY GENERAL

Stacie Lambert deBlieux
Assistant Attorney General
P.O. Box 94005
Baton Rouge, LA 70804
(225) 326-6449

**ATTORNEYS FOR THE STATE OF LOUISIANA**

23

STATE OF MAINE
WILLIAM J. SCHNEIDER
ATTORNEY GENERAL

Christina M. Moylan
Assistant Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8838

**ATTORNEYS FOR THE STATE OF MAINE**

STATE OF MARYLAND
DOUGLAS F. GANSLER
ATTORNEY GENERAL

Ellen S. Cooper
Chief, Antitrust Section
Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, MD 21202-2021
(410) 576-6470

**ATTORNEYS FOR THE STATE OF MARYLAND**

COMMONWEALTH OF
MASSACHUSETTS
MARTHA COAKLEY
ATTORNEY GENERAL

Michael Franck
Assistant Attorney General
Antitrust Division
1 Ashburton Place
Boston, MA 02108
(617) 727-2200

**ATTORNEYS FOR THE COMMONWEALTH OF
MASSACHUSETTS**

24

STATE OF MICHIGAN
BILL SCHUETTE
ATTORNEY GENERAL

Jason R. Evans
Assistant Attorney General
Corporate Oversight Division
525 West Ottawa Street, 6th Floor
Lansing, MI 48933
(517) 373-1160

**ATTORNEYS FOR THE STATE OF MICHIGAN**

STATE OF MISSISSIPPI
JIM HOOD
ATTORNEY GENERAL

Crystal Utley
Consumer Protection Division
P.O. Box 22947
Jackson, MS 39225
(601) 359-4213

**ATTORNEYS FOR THE STATE OF MISSISSIPPI**

STATE OF MISSOURI
CHRIS KOSTER
ATTORNEY GENERAL

Brianna L. Lennon
Assistant Attorney General
PO Box 899
Jefferson City, MO 65102
(573) 751-3376

**ATTORNEYS FOR THE STATE OF MISSOURI**

STATE OF MONTANA
STEVE BULLOCK
ATTORNEY GENERAL

James P. Molloy
Chief, Consumer Protection Division
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026

**ATTORNEYS FOR THE STATE OF MONTANA**

STATE OF NEBRASKA
JON BURNING
ATTORNEY GENERAL

Melissa R. Vincent
Assistant Attorney General
2115 State Capitol
Lincoln, NE 68509-8920
(402) 471-2682

**ATTORNEYS FOR THE STATE OF NEBRASKA**

STATE OF NEVADA
CATHERINE CORTEZ MASTO
ATTORNEY GENERAL
ERIC WITKOSKI
CHIEF DEPUTY ATTORNEY GENERAL
CONSUMER ADVOCATE

Brian Armstrong, Senior Deputy Attorney
General
Bureau of Consumer Protection
10791 W. Twain Ave., Suite 100
Las Vegas, Nevada 89135
(702) 486-342

**ATTORNEYS FOR THE STATE OF NEVADA**

STATE OF NEW HAMPSHIRE
MICHAEL A. DELANEY
ATTORNEY GENERAL

David Rienzo
Assistant Attorney General
New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301-6397
(603) 271-1249

**ATTORNEYS FOR THE STATE OF NEW
HAMPSHIRE**

STATE OF NEW JERSEY
JEFFREY S. CHIESA
ATTORNEY GENERAL

Glenn T. Graham
Jah-Juin Ho
Joshua Rabinowitz
Deputy Attorneys General
124 Halsey Street
Newark, NJ 07101
(973) 648-7457

**ATTORNEYS FOR THE STATE OF NEW
JERSEY**

STATE OF NEW MEXICO
GARY K. KING
ATTORNEY GENERAL

Matthew E. Jackson
Assistant Attorney General
P.O. Drawer 1508
Bataan Memorial Bldg.
Santa Fe, NM 87504
(505) 827-6021

**ATTORNEYS FOR THE STATE OF NEW
MEXICO**

STATE OF NORTH CAROLINA
ROY COOPER
ATTORNEY GENERAL

K.D. Sturgis
Assistant Attorney General
114 West Edenton Street
Raleigh, NC 27603
(919) 716-6000

**ATTORNEYS FOR THE STATE OF NORTH CAROLINA**

STATE OF NORTH DAKOTA
WAYNE STENEHJEM
ATTORNEY GENERAL

Parrell D. Grossman
Director, Consumer Protection and Antitrust Division
Gateway Professional Center
1050 E Interstate Ave., Suite 200
Bismarck, ND 58503-5574
(701) 328-5570

**ATTORNEYS FOR THE STATE OF NORTH DAKOTA**

COMMONWEALTH OF THE
NORTHERN MARIANA ISLANDS
VIOLA ALEPUYO
ACTING ATTORNEY GENERAL

Charles E. Brasington
Assistant Attorney General
Hon. Juan A. Sablan Mem. Bldg., 2nd Floor
Saipan, MP 96950-8907
(670) 664-2393

**ATTORNEYS FOR THE COMMONWEALTH OF NORTHERN MARIANA ISLANDS**

STATE OF OKLAHOMA
E. SCOTT PRUITT
ATTORNEY GENERAL

Julie A. Bays
Assistant Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921

**ATTORNEYS FOR THE STATE OF OKLAHOMA**

STATE OF OREGON
ELLEN F. ROSENBLUM
ATTORNEY GENERAL

Michael A. Kakuk
Assistant Attorney General
1162 Court Street, N.E.
Salem, OR 97310
(503)934-4400

**ATTORNEYS FOR THE STATE OF OREGON**

COMMONWEALTH OF
PENNSYLVANIA
LINDA L. KELLY
ATTORNEY GENERAL

Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-4530

**ATTORNEYS FOR THE COMMONWEALTH OF
PENNSYLVANIA**

COMMONWEALTH OF PUERTO RICO
HON. GUILLERMO A. SOMOZA-
COLOMBANI
ATTORNEY GENERAL

Jose G. Diaz-Tejera
Chief Deputy Attorney General
Office of Monopolistic Affairs
P.O. Box 9020192
San Juan, PR 00902-0192
(787) 721-2900

**ATTORNEYS FOR THE COMMONWEALTH OF PUERTO RICO**

STATE OF RHODE ISLAND
PETER F. KILMARTIN
ATTORNEY GENERAL

Edmund F. Murray, Jr.
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400

**ATTORNEYS FOR THE STATE OF RHODE ISLAND**

STATE OF SOUTH CAROLINA
ALAN WILSON
ATTORNEY GENERAL

C. Havird Jones, Jr.
Assistant Attorney General
P.O. Box 11549
Columbia, SC 29211
(803) 734-3654

**ATTORNEYS FOR THE STATE OF SOUTH CAROLINA**

STATE OF SOUTH DAKOTA
MARTY J. JACKLEY
ATTORNEY GENERAL

Jeffrey P. Hallem
Assistant Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
(605) 773-3215

**ATTORNEYS FOR THE STATE OF SOUTH DAKOTA**

STATE OF TENNESSEE
ROBERT E. COOPER, JR.
ATTORNEY GENERAL & REPORTER

Victor J. Domen, JR.
Senior Counsel
Public Interest Division
P. O. Box 20207
Nashville, TN 37202
(615) 253-3327

**ATTORNEYS FOR THE STATE OF TENNESSEE**

STATE OF UTAH
MARK L. SHURTLEFF
ATTORNEY GENERAL

Ronald J. Ockey
Assistant Attorney General
160 East 300 South, 5th Floor
PO Box 140872
Salt Lake City, UT 84114-0872
(801) 366-0359

**ATTORNEYS FOR THE STATE OF UTAH**

STATE OF VERMONT
WILLIAM H. SORRELL
ATTORNEY GENERAL

Wendy Morgan
Chief, Public Protection Divsision
109 State Street·
Montpelier, VT 05609-1001
(802) 828-5479

**ATTORNEYS FOR THE STATE OF VERMONT**

COMMONWEALTH OF VIRGINIA
KENNETH T. CUCCINELLI, II
ATTORNEY GENERAL

Sarah Oxenham Allen
Antitrust and Consumer Litigation Section
900 E Main Street
Richmond, VA 23219
(804) 786-6557

**ATTORNEYS FOR THE COMMONWEALTH OF VIRGINIA**

VIRGIN ISLANDS
VINCENT F. FRAZER, ESQ.
ATTORNEY GENERAL
VIRGIN ISLANDS DEPARTMENT OF
JUSTICE

34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, VI   00802
(340) 774-5666

**ATTORNEY FOR THE VIRGIN ISLANDS**

STATE OF WASHINGTON
ROBERT M. McKENNA
ATTORNEY GENERAL

Jonathan A. Mark
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 389-3806

**ATTORNEYS FOR THE STATE OF WASHINGTON**

STATE OF WEST VIRGINIA
DARRELL V. McGRAW, JR.
ATTORNEY GENERAL

Douglas L. Davis
Assistant Attorney General
P O Box 1789
812 Quarrier St., 1st Floor
Charleston, WV 25326
(304) 558-8986

**ATTORNEYS FOR THE STATE OF WEST VIRGINIA**

STATE OF WISCONSIN
J.B. VAN HOLLEN
ATTORNEY GENERAL

Gwendolyn J. Cooley
Assistant Attorney General
17 W. Main Street
Madison, WI 53707-7857
(608) 261-5810

**ATTORNEYS FOR THE STATE OF WISCONSIN**

STATE OF WYOMING
GREGORY A. PHILLIPS
ATTORNEY GENERAL

Gregory Phillips
Attorney General
123 State Capitol
Cheyenne, WY 82002
(307) 777-7822

**ATTORNEY FOR THE STATE OF WYOMING**

34

## CERTIFICATE OF SERVICE

I the undersigned hereby certify that the Plaintiff States' Memorandum In Support of

Plaintiff States' Motion for Preliminary Approval of Settlements and Proposed Consumer Notice

and Distribution Plans has been served by U.S.P. S. mail on Counsel for Defendants as follows:

**For Defendant HarperCollins Publishers, LLC:**
Clifford H. Aronson
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522

**For Defendant Hachette Book Group, Inc.:**
Walter Stuart
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue
New York, NY 10022

**For Defendants Simon & Schuster, Inc.**
**and Simon & Schuster Digital Sales, Inc.:**
Helene D. Joffe
Alan Kusinitz
Proskauer Rose LLP
Eleven Times Square
New York, NY  10036

Dated: August 29, 2012

Doreen C. Johnson
Assistant Section Chief, Antitrust Section
Ohio Attorney General's Office

31