# 12 CIV 6625

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE ELECTRONIC BOOKS ANTITRUST )
LITIGATION )          No. 11-md-02293 (DLC)
)          ECF Case
)

This Document Relates to:

)
THE STATE OF TEXAS, et. al., )
)
    Plaintiffs, )          Civil Action No.
)
    v. )
)
HACHETTE BOOK GROUP, INC., et. al., )
)
    Defendants. )
)
)

**MEMORANDUM IN SUPPORT OF PLAINTIFF STATES'
MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS AND PROPOSED
CONSUMER NOTICE AND DISTRIBUTION PLANS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

I.  INTRODUCTION ................................................................................................. 1

II. PROCEDURAL HISTORY .................................................................................. 1

    A.  The States' Investigation ............................................................................. 1

    B.  Settlement Negotiations ............................................................................... 3

III. THE PROPOSED SETTLEMENTS ..................................................................... 4

    A.  Monetary Payments and Distributions ........................................................ 5

        1.  Consumer Compensation ...................................................................... 5

        2.  States' Compensation ............................................................................ 6

        3.  Settlement Notice and Administration Costs ........................................ 6

    B.  Equitable Relief: Injunction ........................................................................ 7

    C.  Release of Claims ........................................................................................ 7

IV. THE SETTLEMENTS MEET THE STANDARDS FOR
    JUDICIAL APPROVAL ....................................................................................... 8

    A.  The Settlements Meet the Standard for Preliminary Approval ..................... 8

    B.  The Settlements Are Fair, Reasonable and Adequate .................................. 11

        1.  The Settlement Process was Procedurally Fair ...................................... 11

        2.  The Settlements are Reasonable, Adequate and Substantively Fair ........ 13

            a.  The relative strength of plaintiffs' case ........................................... 14

            b.  Difficulties of proof or strong defenses ........................................... 15

            c.  The anticipated complexity, duration and expense of
               additional litigation ......................................................................... 15

           d.    The solvency of the Settling Publishers ........................................... 17

           e.    The reaction of the settlement group ................................................ 17

           f.     The range of reasonableness of the settlement amount in light
                 of the best possible recovery ........................................................... 17

V.     THIS COURT SHOULD APPROVE THE PROPOSED CONSUMER
       DISTRIBUTION PLAN .......................................................................................... 20

     A.    Consumer Distribution Plan ........................................................................ 20

     B.    The Distribution Plan is Fair and Reasonable ................................................. 23

VI.    THE PROPOSED NOTICE PLAN SHOULD BE APPROVED
       BY THE COURT ................................................................................................... 24

     A.    Description of the Notice Plan ........................................................................ 25

     B.    The Proposed Notice Plan Meets the Requirements of Due Process ............. 27

VII.  CONCLUSION ....................................................................................................... 28

APPENDICES:

Appendix A          Hachette Settlement Agreement

Appendix B          HarperCollins Settlement Agreement

Appendix C          Simon & Schuster Settlement Agreement

Appendix D          Escrow Agreement

Appendix E          Expert Affidavit

Appendix F          Consumer Distribution Plan

Appendix G          Rust Consulting Declaration

Appendix H          Notice Plan

Appendix I           Kinsella Declaration

Appendix J           Proposed Preliminary Approval Order

## I.    INTRODUCTION

Plaintiff States[1] respectfully submit this memorandum in support of their motion for

preliminary approval of their settlements with HarperCollins Publishers, LLC, Hachette Book

Group, Inc. and Simon & Schuster, Inc. and its subsidiary Simon & Schuster Digital Sales, Inc.

(collectively, "Settling Publishers"), pursuant to Sections 4C and 16 of the Clayton Act, 15 U.S.C.

§§ 15c and 26.  The proposed Settlements, which provide for the payment of over $69 million and

the imposition of injunctive relief for the benefit of consumers, resolve claims brought by the

States alleging an unlawful agreement to fix the prices of electronic books ("E-books") in

violation of federal antitrust laws.

The Plaintiff States submit that the proposed Settlements are sufficiently fair, reasonable

and adequate to justify providing notice to affected consumers throughout the United States, and

initiating a procedure under which consumers may qualify for credits or a check based on their E-

book purchases.

## II.    PROCEDURAL HISTORY

### A.    The States' Investigation

The Plaintiff States' Complaint filed in this action alleges that three of the largest book

publishers in the United States – Hachette, HarperCollins, and Simon & Schuster, along with

other co-conspirators – entered into an unlawful conspiracy to switch from the traditional

wholesale/retail model of distribution to an agency model with the major retailers of E-books in

order to raise and fix the prices of E-books to consumers.  Across all E-book outlets such as

Amazon and Barnes & Noble, the conspiracy significantly increased prices paid by consumers of

---

[1] "Plaintiff States" include all States and Commonwealths (except Minnesota), the District of Columbia, and five
territories: Guam, the Virgin Islands, Puerto Rico, American Samoa and the Northern Marianna Islands.

New York Times best-selling books, as well as frontlist E-books (books sold within one year of publication) and backlist E-books (books sold more than one year after publication).

Like the complaint filed by 33 State Attorneys General in *State of Texas et al., vs. Penguin Group (USA), Inc., et al.*, 12-cv-3394 (DLC), the Complaint filed in this action is the culmination of a two-year investigation by the States of Texas and Connecticut, coordinated with a separate investigation by the United States Department of Justice ("DOJ"). The States' investigation began following public reports of an anticipated widespread change in the standard industry E-book distribution model and an anticipated price increase for New York Times Bestselling E-books in March of 2010.

Starting on April 7, 2010, Texas and Connecticut issued 21 civil investigative demands ("CIDs") requiring production of documents, sworn responses and sworn statements. The DOJ issued several follow-up CIDs, and CIDs to additional industry participants. Each enforcement agency generally had access to the materials produced in response to all of the CIDs. In evaluating the conduct at issue, the States reviewed over 250,000 responsive documents and 300 interrogatory responses. Among the documents reviewed by the States were e-mail communications between and among the conspirators' chief executive officers, as well as phone logs and other records that evidenced communications and agreement among them.

Connecticut and Texas conducted 55 interviews with various interested parties and took sworn statements from six individuals, including the CEOs of HarperCollins, Macmillan and Simon & Schuster, certain other executives at these companies with responsibilities for E-books, as well as executives at Hachette. After the States took sworn statements of executives at Hachette and HarperCollins, DOJ took corporate representative sworn statements of five of the six largest publishers in the country – Hachette, HarperCollins, Simon & Schuster, Penguin and

2

Macmillan ("the Agency Five") – and Apple, Inc.  The States attended each of these depositions.

**B.      Settlement Negotiations**

By June 2011, the investigating States had concluded that the actions of the publishers and

Apple likely constituted an anticompetitive conspiracy in restraint of trade.  Accordingly, in

coordination with the DOJ, the States began meeting with the publishers to discuss these concerns

and afford the publishers the opportunity to resolve them.  In meetings over the next nine months,

the publishers were represented by some of the most capable and renowned law firms in the

world, as well as expert economists and senior members of their management teams.

By late fall of 2011, the parties were discussing potential changes to business practices to

help alleviate the States' concerns.  In a series of conference calls and in-person meetings, the

States engaged the Settling Publishers separately, both as to the States' rationale for the demanded

injunctive relief and the appropriate amount of consumer damages.  The States presented the

Settling Publishers with economic evidence that their conspiracy had engendered E-book price

increases across their respective catalogues.[2]  By April 2012, the Settling Publishers had agreed in

principle with the DOJ and States on the basic terms of injunctive relief.

Declining to settle solely for injunctive relief, the States continued to seek appropriate

consumer damages and to prepare for litigation against the remaining conspirators.  On April 11,

2012, Connecticut and Texas reached a preliminary agreement with Hachette and HarperCollins

as to the terms of a monetary settlement and injunctive relief, and executed a memorandum of

understanding ("MOU") with each.  That same day, sixteen (16) states, including Texas and

---

2 During the course of the negotiations, Professor Abraham Wickelgren, an expert economist on the faculty of the
University of Texas, assisted the States in calculating the consumer damages caused by the E-books conspiracy.

Connecticut, filed an antitrust Complaint against the non-settling publishers, Simon & Schuster, Macmillan and Penguin, and E-book retailer Apple, Inc. Even after filing suit, the States continued their efforts to reach settlement with other parties. In the face of the enforcement action, Simon & Schuster continued negotiations with the States. On May 10, 2012, the States signed a substantially identical MOU with Simon & Schuster, which was subsequently dismissed from the lawsuit.

After executing the MOUs, counsel for Hachette, HarperCollins, Simon & Schuster and the Attorneys General for Texas, Connecticut and Ohio ("State Liaison Counsel") began the arduous process of reducing their preliminary agreements to final settlement agreements that they could submit to the Court for approval. After more than a dozen extensive telephone conferences and innumerable exchanges of proposals, counterproposals, and drafts, the parties were able to craft settlements that are fair, adequate and reasonable in light of the various claims and defenses.

On June 11, 2012, State Liaison Counsel executed the Settlement Agreements that are submitted for approval today. Over the next two months, the Attorneys General of all of the states and territories reviewed the terms of the settlements. The Settlement Agreements have now been signed by the Attorneys General for 49 states, 5 territories and the District of Columbia, representing 98.2 % of the Settling Publishers' E-book sales to consumers in 2011. The complete settlements with Hachette, HarperCollins and Simon & Schuster are attached as *Appendices A, B and C*, respectively.

### III. THE PROPOSED SETTLEMENTS

The agreements with Settling Publishers are each comprised of two components: (1) monetary relief in the form of damages and costs and fees; and (2) equitable relief in the form of an injunction.

A.      **Monetary Payments and Distributions**

      **1. Consumer Compensation**

    The primary component of each Settlement Agreement is payment of compensation to consumers who purchased E-books from any Agency Five co-conspirator publisher from April 1, 2010 to May 21, 2012, the period the Plaintiff States allege the Settling Publishers participated in the conspiracy.  Under the Settlement Agreements, these amounts are to be paid within 30 days of the Preliminary Approval Order into three segregated consumer compensation escrow accounts established by the States' Escrow Agent.[3]  The escrow funds are intended to be qualified settlement funds within the meaning of Treas. Reg. Sections 1.468B-1, *et seq.*, and distributions from escrow are subject to the Settlement Agreements and further orders from this Court.

    Each Settling Publisher's consumer compensation payment will, under Paragraph IV.B of each Settlement Agreement, be reduced proportionately by the percentage of that Publisher's E-book sales for 2011 attributable to any state or territory that does not participate in the Settlement.  Only Minnesota, which accounts for 1.67% of Hachette's 2011 sales, 1.78% of HarperCollins' sales, and 1.92% of Simon & Schuster's sales, did not participate in the Settlements.  Accordingly, the negotiated total of $70,280,000 for consumer compensation will be discounted to a total of $69,039,151.00, payable as follows:

| | |
|---|---|
| Hachette: | $31,711,425.00 |
| HarperCollins: | $19,575,246.00 |
| Simon & Schuster: | $17,752,480.00 |

---

3 The Ohio Attorney General has entered into a contract with Fifth Third Bank to act as the States' Escrow Agent. Under the Escrow Agreement, attached hereto as *Appendix D*, distributions from the escrow account can only be made upon written directions.

These funds, together with any accrued interest, will be distributed according to the

Consumer Distribution Plan, described in Section V. If, for some reason, consumer funds remain

after distribution, the Settlement Agreements contemplate such funds be reserved for additional

future consumer distribution resulting from settlement or judgment. Residual may be distributed

*cy pres* to an organization or organizations dedicated to reading, literacy or access of the public

to E-books, subject to any applicable state laws mandating a different distribution with respect to

any particular state's allotment.

### 2. States' Compensation

In addition to consumer compensation, the Settling Publishers will collectively pay to the

Plaintiff States the amount of $7.625 million, to be divided among the Plaintiff States as agreed

among themselves for several delineated purposes, including reimbursements for costs of

investigation, attorneys' fees incurred in obtaining approval of the settlement, and costs of

litigation against the non-settling publishers. These monies are to be paid into a segregated State

Compensation escrow account within 30 days of entry of the Preliminary Approval Order. Thus,

no part of the consumer compensation funds will be used for reimbursement of the States' costs

or other fees or expenses.

### 3. Settlement Notice and Administration Costs

The final component of monetary relief is the payment by the Settling Publishers of the

reasonable costs associated with administering the settlements, including expert costs and the

consumer notice and distribution program. The sum of $100,000.00 per Settling Publisher has

already been paid into a segregated Escrow Account, and an additional sum of $650,000.00 per

Settling Publisher is to be paid into escrow for this purpose within five (5) days of the filing of

this Motion for Preliminary Approval. The Settling Publishers must make additional payments

to the Settlement Cost Account as needed upon notice from State Liaison Counsel.

**B.      Equitable Relief: Injunction**

In addition to the monetary terms of the Settlement, the Settling Publishers have agreed to an injunction with both the Plaintiff States and the United States Department of Justice (DOJ). The terms and conditions of the DOJ's Proposed Final Judgment in *United States of America v. Apple, Inc., et al.,* Case No. 12-cv-2826 (S.D.N.Y.) are specifically incorporated into the Settlement Agreements, and are enforceable by the Plaintiff States.  In addition, each Settling Publisher must provide to State Liaison Counsel the notices and reports required pursuant to Sections VII and VIII of the Stipulated Injunction, which is attached to each Settlement Agreement as Attachment B.

Any changes made to DOJ's proposed injunctive relief in the course of its consideration and approval by the Court will be automatically incorporated into the States' Stipulated Injunction.  The injunction precludes further conspiratorial conduct, establishes a monitoring and reporting program and imposes certain requirements that must be met if publishers and retailers wish to continue to conduct business under the agency model.  These requirements are intended to reestablish price competition at the retail level in a market free of the taint of the prior conspiracy.

**C.      Release of Claims**

In return for the injunctive relief and the monetary payments specified in the Settlement Agreements, the Plaintiff States will, in the exercise of their *parens patriae* authority under 15 U.S.C. §15c, release the claims of individual consumers who purchased E-books from any of the Agency Five publishers during the period from April 1, 2010 to May 21, 2012, with the exception of claims of individual consumers who exercise the right to exclude themselves from

the Settlements and the claims of any consumers in Minnesota. Claims are released against the Settling Publishers only, not against the non-settling publishers or Apple. Thus, all of the eligible consumers may be entitled to further compensation from any funds that may become available as a result of the ongoing litigation. The Plaintiff States will also release their sovereign enforcement claims against Settling Publishers that arise from the conduct alleged in the complaint. Finally, the Plaintiff State Attorneys General agree not to seek otherwise to establish liability against, or seek damages from, the Settling Publishers based on the conduct set forth in the Complaint filed in this case.

## IV.   THE SETTLEMENTS MEET THE STANDARDS FOR JUDICIAL APPROVAL

### A.   The Settlements Meet the Standard for Preliminary Approval

This case has been brought by the Attorneys General of the Plaintiff States in their capacity as *parens patriae* and under the authority of Section 4C of the Clayton Act, 15 U.S.C. §15c, which provides that State Attorneys General may bring federal antitrust claims for damages on behalf of natural person residents of the state. While Section 4C does not set forth a standard by which proposed *parens patriae* settlements are approved, courts in the Second Circuit and New York District Courts have adopted the approval standards used in class action settlements: the Court will approve settlement agreements if they are fair, reasonable and adequate. *See, e.g., In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000); *New York v. Salton, Inc.*, 265 F. Supp. 2d 310, 313 (S.D.N.Y. 2003); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). Courts are further guided by the strong judicial policy favoring settlement. *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 338 (S.D.N.Y. 2005), *rev'd on other grounds*, 443 F.3d 253 (2d Cir. 2006); *Weinberger*, 698 F.2d at 74.

8

Court approval of *parens patriae* and class action settlements is a two-step process. In the first step, the court makes a preliminary evaluation of the fairness of the settlement. *In re Nasdaq Market-Makers Antitrust Litig.,* 176 F.R.D. 99, 102 (S.D.N.Y. 1997). "Once preliminary approval is bestowed, the second step of the process ensues; notice is given to the class members of a hearing, at which time class members and the settling parties may be heard with respect to final court approval." *Id.*

Preliminary approval does not require a full fairness hearing. Rather, "[w]here the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted." *In re Currency Conversion Fee Antitrust Litig.*, No. M 21-95, 2006 U.S. Dist. LEXIS 81440, at *13 (S.D.N.Y. Nov. 8, 2006) (quoting *In re Nasdaq Market–Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)). *See also Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 209 (S.D.N.Y. 1995) (citing FED. JUDICIAL CTR., MANUAL FOR COMPLEX LITIG., 237 (3d ed. 1995)). "Preliminary approval of a class action settlement, in contrast to final approval, is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness." *Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*, No. 08 CV 321 (VB)(PED), 2012 U.S. Dist. LEXIS 37720, at *12 (S.D.N.Y. Feb. 24, 2012) (quoting *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010).

All counsel were well informed of the issues when entering into the Settlement Agreements. As detailed above, attorneys for Texas, Connecticut and the DOJ had conducted extensive investigations before broaching settlement negotiations, which proceeded in earnest in

9

late 2011. Negotiations were lengthy, often adversarial and time-consuming, with each side fully articulating its positions, which were often rejected by the other. Ultimately, these negotiations resulted in Memoranda of Understanding which were then additionally negotiated, refined and expanded into the Settlement Agreements submitted for this Court's approval.

Plaintiff States submit that there is no reason to doubt the fairness of these Settlements, nor are there any "obvious deficiencies." The $69.04 million settlement amount for consumers is extremely significant relative to consumer-related settlements in general and certainly falls within the range of possible approval for this case specifically. Moreover, these Settlement Agreements account for only a partial settlement of an ongoing case, reinforcing the conclusion that this is a substantial recovery. No consumers are granted preferential treatment, as all eligible consumers throughout the United States (except those in Minnesota, whose Attorney General has elected not to participate in this settlement) will be entitled to a credit or a check from the consumer fund.

No part of the $69.04 million consumer fund will be used for administrative costs or attorneys' fees. A separate fund totaling $7.625 million will be used by Plaintiff States for payment of investigation and litigation costs, attorney's fees and/or any of the other purposes specifically identified in the Settlement Agreements.[4] A third separate account has already been established and funded to pay for all reasonable costs and expenses related to the administration of these Settlements.

The settlement negotiation process and the substantive terms of the agreements as explained above are sufficient, without more, to support preliminary approval of these Settlement Agreements.

---

[4]  A separate fund for payment of attorneys' fees provides the beneficiaries of the settlement greater certainty because the amount of money each will receive is not reduced by an award of attorneys' fees. *In re Vitamins Antitrust Litig.*, No. 99-197 (TFH), 2000 U.S. Dist. LEXIS 8931, at *21 n.3 (D.D.C. Mar. 30, 2000).

**B.      The Settlements Are Fair, Reasonable and Adequate**

In evaluating the settlements for preliminary approval, the Court may find it instructive that the Settlements largely meet the more comprehensive requirements for final approval.

When considering final approval, a court must consider the unique facts in each case, weigh the factors that are most relevant in the circumstances and exercise its discretion in deciding whether the proposed settlement is fair, adequate and reasonable. "[I]n any case there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in a particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). Final approval will be upheld on appeal short of a clear showing of abuse of discretion. *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009); *Ouellette v. Cardenas (In re Sony Corp. Sxrd),* 448 Fed. App'x 85, 87 (2d Cir. 2011).

**1.      The Settlement Process was Procedurally Fair.**

The initial determination of fairness, often called "procedural fairness," focuses on the settlement process itself. *Ebbert v. Nassau County*, No. CV 05-5445 (AKT), 2011 U.S. Dist. LEXIS 150080, at *20 (E.D.N.Y. Dec. 22, 2011); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 238-39 (E.D.N.Y. 2010). The court must determine if the settlement was the result of good-faith bargaining at arms-length by experienced counsel after reasonable discovery and not based on fraud or collusion. Such findings support a presumption that the settlement is fair. *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995), *aff'd,* 96 F.3d 44 (2d Cir. 1996); *McReynolds*, 588 F.3d at 803 (citing *Wal-Mart Stores Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)).

When evaluating these issues, courts recognize that the opinion of experienced and informed counsel supporting settlement should be afforded substantial consideration. *In re Nasdaq Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 515 (S.D.N.Y. 1996); *New York v. Keds Corp.*, 1994-1 Trade Cas. (CCH) ¶ 70,549, at 71,966 (S.D.N.Y. Mar. 17, 1994); *Reebok Int'l, Ltd.*, 903 F. Supp. at 535. The attorneys representing all parties to these settlements are both experienced and informed. Outside counsel for Settling Publishers have significant expertise in complex antitrust litigation and practice at some of the largest and most successful law firms in the country. The Assistant Attorneys General in the offices of the Attorneys General for Texas, Connecticut and Ohio who negotiated the Settlement Agreements, individually and collectively, have extensive experience with antitrust investigations and litigation.

Significantly, Attorneys General of fifty-five states, commonwealths and territories have reviewed, considered and approved the settlements on behalf of their consumers. "The Attorneys General have extensive expertise in complex antitrust cases brought under their *parens patriae* powers." *New York v. Nintendo of Am.*, 775 F. Supp. 676, 680 (S.D.N.Y. 1991). Indeed, this action is part of a long and successful tradition of multistate litigation by State Attorneys General. *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93 (1989); *Hartford Fire Ins. v. California*, 509 U.S. 764 (1993); *In re Panasonic Consumer Elect. Prod.*, 1989-1 Trade Cas. (CCH) ¶ 68,613 (S.D.N.Y. 1989); *Colorado v. Airline Tariff Publ's Co.*, 1995-2 Trade Cas. (CCH) ¶ 71,231 (D.D.C. 1995).

In addition, courts are entitled to place special weight on the fact that a settlement agreement is negotiated by government attorneys committed to protect the public interest. *Wellman v. Dickson,* 497 F. Supp. 824, 830 (S.D.N.Y. 1980), *aff'd*, 682 F.2d 355 (2d Cir. 1982); *see also New York v. Reebok Int'l. Ltd.*, 96 F.3d 44, 48 (2d Cir. 1996) (noting Attorneys General

12

in *parens* actions are motivated by concern for the public interest); *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000) (the participation of the State Attorneys General furnishes extra assurance that consumers' interests are protected).

As detailed above, settlement discussions were only initiated after a lengthy investigation and were conducted by informed counsel who vigorously advocated their clients' positions. These Settlement Agreements are neither premature nor arbitrary or lacking foundation. Rather, they are the end result of a good-faith, procedurally fair process.

### 2.    The Settlements are Reasonable, Adequate and Substantively Fair

Additional issues have been identified for courts to review when determining whether class action settlements are fair, adequate and reasonable for purposes of final approval.   In previous Clayton Act *parens patriae* cases, this court identified five factors that courts should consider after having determined the initial fairness of the settlement process:

(1) the relative strength of the plaintiff's case;

(2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial;

(3) the anticipated duration and expense of additional litigation;

(4) the solvency of the defendants; and

(5) the degree of opposition to the settlement.

*New York v. Reebok Int'l. Ltd.*, 903 F. Supp. 532, 535-36 (S.D.N.Y. 1995); *New York v. Keds Corp.*, No. 93 Civ. 6708 (CSH), 1994 U.S. Dist. LEXIS 3362, at *5 (S.D.N.Y. Mar. 17, 1994); *New York v. Nintendo of Am., Inc.*, 775 F. Supp. 676, 681 (S.D.N.Y. 1991) (citing to five factors noted in *In re Montgomery County Real Estate Antitrust Litig.*, 83 F.R.D. 305 (D. Md. 1979)).

When considering class action settlements for final approval, Courts in this circuit have also cited the nine factors identified by the court in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).[5] *See, e.g., Gorey v. Manheim Serv.Corp.*, No. 10 Civ. 1132 (JSG)(LMS), 2012 U.S. Dist. LEXIS 30961, at *8-9 (S.D.N.Y Feb 3, 2012). The *Grinnell* factors are, however, generally incorporated in the procedural fairness inquiry and five-factor test, or are inapplicable in a *parens patriae* case. Therefore, with one addition, it is the five-factor test that will be specifically addressed hereafter.

a.     **The relative strength of plaintiffs' case**

Plaintiff States believe they have an exceptionally strong case as demonstrated by their ongoing litigation with non-settling co-conspirators. The States' case includes direct evidence of meetings and communications between and among co-conspirators coinciding with simultaneous market behavior and the agency contracts Plaintiff States allege are the products of illegal, collective decision-making. But, as with all complex antitrust cases alleging a conspiracy to restrain trade, the risks of being able to establish agreement among the Settling Publishers and co-conspirators, or otherwise prove liability, are significant even under a *per se* analysis.

Proving damages would also present significant litigation risks. Plaintiff States have worked with Professor Abraham Wickelgren in developing a damages analysis for settlement purposes. He has done an extensive economic analysis of potential damages caused by the conspiracy as set forth in the Plaintiff States' Complaint. Professor Wickelgren has established

---

5 These nine factors are 1) complexity, expense and likely duration of the litigation, 2) reaction of the class to settlement, 3) state of the proceeding and amount of discovery completed, 4) risks of establishing liability, 5) risks of establishing damages, 6) risks of maintaining the class action through the trial, 7) ability of defendant to withstand a greater judgment, 8) range of reasonableness of settlement fund in light of best possible recovery, and 9) range of reasonableness of settlement fund to a possible recovery in light of the attendant risks of litigation. *Grinnell Corp.*, 495 F.2d at 470 (2d Cir. 1974).

that the quantification of damages in the E-book market is complicated: one must identify the changes in book prices over time under two significantly different pricing models for multiple book categories marketed to a wide variety of consumers. *See Affidavit of Professor Abraham Wickelgren, attached hereto as Appendix E, Expert Affidavit.* Even though Plaintiff States believe substantial damages will be provable at trial, the complex nature of a damages analysis would add litigation costs and risks.

### b.  Difficulties of proof or strong defenses

All three Settling Publishers strongly deny any wrongdoing and assert that neither the law nor the facts of the case will support any recovery. Relying on *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), they assert their actions were merely parallel, unilateral, or justified by market forces and completely legal. Settling Publishers also argue that their actions had procompetitive effects on the E-book market and that some E-book prices decreased after the adoption of the agency model. Plaintiff States submit that their evidence to the contrary is remarkably strong, but litigating the claims and defenses would require meticulous focus on the specific communications and actions of each Settling Publisher, and would necessarily entail a risk that the fact finder would find one or more Settling Publisher not liable, or that the damages caused by the conspiracy were less than alleged by the States.

### c.  The anticipated complexity, duration and expense of additional litigation

"Federal antitrust cases are complicated, lengthy and bitterly fought." *Wal-Mart Stores, Inc., v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005); *In re Shopping Carts Antitrust Litig.*, 1984-1 Trade Cas. (CCH) ¶ 65,823, at 67,443 (S.D.N.Y. Nov. 18, 1983) (citing *Grinnell*, 495 F.2d at 467-68). This litigation is no exception.

Because Plaintiff States continue their litigation against the non-settling defendants, Plaintiff States will not avoid all the costs of litigation, even with Court approval of these settlements. But the savings of avoiding the additional discovery, motions practice, expert analysis and trial which would otherwise have to be directed to the three Settling Publishers is substantial. In addition, the benefits of having a substantial, guaranteed recovery for consumers are impressive when viewed against the litigation risks and the significant chance of appeal. This is especially true if, as is being considered, the States' case is bifurcated such that litigation on damages will proceed only if plaintiffs are successful at the liability trial. *Ebbert v. Nassau County*, No. CV 05-5445 (AKT), 2011 U.S. Dist. LEXIS 150080, at *25-26 (E.D.N.Y. 2011) ("Even assuming that Plaintiffs prevailed at [the liability] trial, there would have been further significant delay in ascertaining damages, thus delaying monetary relief to the class members if they were successful").

Early settlement has far-reaching benefits to the judicial system in the context of a complex antitrust action. "[A] prompt and efficient attorney who achieves a fair settlement without litigation serves both his client and the interests of justice." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002) (citing *McKenzie Constr. Inc. v. Maynard*, 758 F.2d 97, 101-02 (3d Cir. 1985). Speed of settlement must be balanced against the ability of the parties to gather information adequate to assess their risks of litigation. As discussed above in Section II.A., in this case, Plaintiff States have conducted extensive pre-complaint discovery, providing a solid foundation to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation. The timing of the settlements relative to the filing of the litigation (two Memoranda of Understanding signed on the eve of suit and the third signed within a month thereafter) dramatically reduced the actual and

potential litigation costs. These factors weigh in favor of approving the Settlements.

### d. The solvency of the Settling Publishers

Plaintiff States acknowledge that Settling Publishers would be able to withstand a higher judgment. As such, neither potential insolvency nor lack of ability to pay is a factor that needs to be considered, or accorded much weight in the Court's determination.

### e. The reaction of the settlement group

At the stage of preliminary approval, the degree of opposition by consumers to the Settlements, if any, is not known.[6] If the Court grants preliminary approval, consumers will receive notice explaining the terms of the Settlement and their right to object or opt out. The States expect few eligible consumer purchasers will opt out. This is especially true because the States expect to provide both direct notice and automatic credits to the vast majority of eligible consumers, simplifying the claims process and allowing most eligible recipients to easily take advantage of the settlement funds. *See, Consumer Distribution Plan* and *Consumer Notice Plan,* attached hereto as Appendices F and H.

### f. The range of reasonableness of the settlement amount in light of the best possible recovery

One *Grinnell* factor is not obviously encompassed in the five-factor discussion above. The eighth *Grinnell* factor asks the court to balance the settlement against a best possible recovery. In so balancing, "the Court is not required to engage in a trial on the merits to determine the prospects of success. Similarly, the Court is not to compare the terms of the Settlement with a hypothetical or speculative measure of a recovery that might be achieved by

---

6 The States are aware that there has been opposition to the injunctive relief in the related DOJ Tunney Act proceeding. However, because the Settlement Agreements provide that the States' injunction will automatically incorporate any changes to the DOJ injunction required by the Court the issues do not need to be addressed in this context.

prosecution of the litigation to a successful conclusion." *In re Veeco Instr. Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85629, at *33 (S.D.N.Y. Nov. 7, 2007) (internal citations omitted).

Typically, the court will begin to evaluate the reasonableness of the settlement amount by looking at an estimated benchmark damages amount. This estimated damages amount is "frequently measured by the comparison of the fixed or monopoly price and the price that would have prevailed in the absence of the illegal conduct, often referred to as the 'but for' price: what the competitive price would have been but for the illegal conduct." PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW, 394 at n.2 (Aspen Law & Business, 2d ed. 2001). The court's evaluation then must not only compare the percentage of the settlement amounts to the full estimated damages but must also weigh that comparison in light of all the risks of litigation. In the present case, the Plaintiffs' economic expert has submitted a detailed affidavit describing his analyses and opinions concerning the combined estimated damages for the three Settling Publishers and has also calculated the estimated damages for each of the three categories of books which make up the total: New York Times Bestsellers, frontlist books and backlist books. Dr. Wickelgren's total estimated damages for the three Settling Publishers are $135.79 million. *See Appendix E ¶25, Expert Affidavit*.

These Settlements provide a significant recovery that will reimburse millions of consumers a substantial amount of their damages. The consumer compensation amount under the Settlements is 51% of the total estimated damages for these publishers. This is a significant percentage settlement which obviously "falls within the range of possible approval" for purposes of preliminary approval. Courts have approved settlements for much less than the substantial 51% that is presented here for approval. *See, e.g., In re Veeco Instruments Inc. Sec. Litig.*, 2007

U.S. Dist. LEXIS 85629, at *33-34 (23% of estimated damages); *Weinberger v. Kendrick*, 698

F.2d 61, 65 (2d Cir. 1983) (settlement which amounted to only a negligible percentage of the

losses suffered affirmed); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596

(S.D.N.Y. 1992) (settlement providing "slightly more than 48 cents [per share]" out of the

potential recovery of approximately $30 per share approved); *In re Remeron Direct Purchaser*

*Antitrust Litig.*, No. 03-0085 (FJH), 2005 U.S. Dist. LEXIS 27013, at *25-26 (D. N.J. Nov. 9,

2005) (noting several settlements which had been approved with recoveries ranging from 10% to

36% of estimated damages)...

This recovery is an even better recovery than the percentage alone would indicate, as it is

only a partial recovery. Further settlements or judgments against the non-settling defendants

could provide consumers 100% or more of their single damages, as liability of co-conspirators is

joint and several for treble damages.

Professor Wickelgren also calculated a range of estimated damages, taking into account

the various litigation risks that have been identified by Plaintiff States' counsel for the three

categories of books. His range of estimated damages, discounted accordingly, is between $54.41

million and $88.36 million. *See Appendix E ¶28, Expert Affidavit.* Comparing the settlement

amount to this range of appropriately discounted estimated damages, reinforces the conclusion

that the settlement recovery is fair and adequate.

The facts and law relevant for this Court's consideration of preliminary approval

overwhelmingly support submitting these settlements to the consumers represented by the

Attorneys General of the Plaintiff States and thereafter holding a hearing for final approval.

## V.     THIS COURT SHOULD APPROVE THE PROPOSED CONSUMER DISTRIBUTION PLAN

The Settlements provide that the Plaintiff States shall submit to the Court a proposed Consumer Distribution Plan.  This distribution plan is described in detail in the following sections.  For this Court's convenience and ease of reference, the Distribution Plan is more fully described in *Appendix F*, attached hereto.  This distribution proposal is intended to fairly compensate consumers for their estimated damages.

### A.     Consumer Distribution Plan

Plaintiff States have $69.04 million to distribute for purposes of compensating all eligible consumers the States allege were injured by the antitrust violations set out in the Complaint.  The goal of the Plan is to compensate the largest possible number of injured consumers in a way that makes it very simple for them to participate and receive value, either as a credit to their E-book accounts, or, if preferred, in the form of a check.  The States propose to compensate consumers who purchased E-books from Hachette, HarperCollins, Simon & Schuster, Macmillan and Penguin during the period from April 1, 2010 to May 21, 2012,[7] the time period the Settling Publishers are alleged to have participated in the conspiracy.

For each book that was on a New York Times bestseller list (Fiction, Non-Fiction and Advice) during this eligibility period, the distribution will be $1.32 per unit.  For each book that was not on the New York Times Bestseller list, and was sold within a year of initial publication

---

7  In order to accord total release from liability for the Settling Publishers, distributions will be made to consumers who purchased E-books from the non-settling conspiring publishers as well as those who purchased from the Settling Publishers.  Purchasers from non-settling publishers have claims against the Settling Publishers under the well-established rule of joint and several liability for co-conspirators under the antitrust laws.  *Texas Indus. v. Radcliff Materials, Inc.*, 451 U.S. 630, 645-46 (1981).  It is anticipated that any monies later recovered from the non-settling publishers or Apple, whether through settlement or as a result of a judgment in the litigation, will similarly be distributed to purchasers of E-books from any of the Agency Five publishers as and when such funds become available.

(frontlist), the distribution will be $0.36 per book. For each book that was not on the New York Times Bestseller list and was sold more than one-year following initial publication (backlist), the distribution will be $0.25 per book. As an example, then, a consumer who purchased ten New York Times bestsellers published by HarperCollins, ten frontlist books published by MacMillan, and ten backlist books published by Simon & Schuster from April 1, 2010 to May 21, 2012 would be entitled to compensation totaling $19.30 (10 x 1.32 + 10 x .36 + 10 x .25).

These overcharge amounts were estimated by the States' expert economist, Dr. Abraham Wickelgren, and discounted based on the differing litigation risks for each category of books. However, where it may not be technologically feasible to compensate consumers differently for frontlist and backlist books, Dr. Wickelgren has employed a similar methodology to calculate the compensable overcharge for a combined category of non-New York Times Bestsellers. The compensable overcharge for this combined category would be $0.30 per book. *See, Appendix E, ¶ 31-36 Expert Affidavit.*

A 5% holdback will be made initially to account for potential claims greater than anticipated. Thus, these initial per-book distribution amounts are calculated based on a settlement amount of $65.6 million. Following completion of the claims period, the per-unit recoveries will be recalculated as necessary to distribute the full $69.04 million available.

The technology associated with the purchase of E-books provides multiple avenues for consumers to realize the value of their specific distribution amounts. Under the Distribution Plan, consumers may choose to receive the value of their distribution either by applying it to additional purchases of E-books or print books in the form of credits on their current accounts, or by requesting a check for the same amount.

The States have been working with all of the major retailers of E-books to develop a process under which each of their eligible customers can be identified, distribution amounts calculated, and credits applied to customer accounts. Because the three largest E-book retailers – Amazon, Barnes & Noble and Apple – have agreed to cooperate in the Consumer Distribution Plan, up to 97% [8] of all consumers will, after this Court's final approval of the settlements, be eligible to automatically receive a credit to their Kindle, Nook or iBookstore accounts without taking any action. Kobo customers will also be able to receive automatic credits. Any consumer that wishes to receive a check instead of a credit will be able to go to the Settlement website and provide information sufficient for the States' claims administrator, Rust Consulting (hereinafter "Claims Administrator") to mail a check. *Appendix G, Declaration of Kim Schmidt, Vice President of Rust Consulting, Inc.* The Claims Administrator will provide a list of customers who have elected either to opt-out or to receive a check to each retailer participating in the distribution of credits.

Similarly, customers of E-books retailers that are not technologically able to provide automatic credits but are able to provide data on eligible purchases to the Claims Administrator will automatically receive checks. Sony purchasers will fall into this category.[9] At present, Google can only send notices to potentially eligible customers, which will help customers determine how they can supply purchase information to submit claims on the Settlement website established by the Attorneys General.

---

8 Amazon and Barnes & Noble combined are estimated to have an 85% share of the E-book market, with Apple accounting for an additional 12% share. *Appendix E, Expert Affidavit, Appendix B Market Shares.*
9 Sony is still working with the States on a plan to compensate its customers, and it remains possible that an automatic coupon code system could be implemented.

22

After final approval, the retailers will credit customers' accounts and inform such customers that their credits are available to use. The retailers will also send an email reminder after six months to customers that have not used their credits. Reimbursement to a retailer for credits used by its customers will be provided from the Escrow funds upon proper invoicing by the retailer. Unused customer credits shall expire on the first anniversary of the date of crediting.

## B.   The Distribution Plan is Fair and Reasonable

The fair, adequate and reasonable standard applies with as much force to the review of the allocation agreement as it does to the review of the overall settlement between the States and Settling Publishers. *In re PaineWebber Ltd. P'ship Litig.*, 171 F.R.D. 104, 132-33 (S.D.N.Y. 1997) (quoting *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1402 (E.D.N.Y. 1985)). Approval of a plan of distribution is within the discretion of the Court. *West Virginia v. Chas. Pfizer & Co., Inc.*, 440 F.2d 1079, 1085 (2d Cir. 1971); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, [1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,978 (S.D.N.Y. Nov. 20, 1995); *White v. National Football League*, 822 F. Supp. 1389, 1417 (D. Minn. 1993).

Plaintiff States' proposed Distribution Plan is intended to compensate all eligible consumers for overcharges incurred on their purchases of New York Times bestsellers, backlist E-books and frontlist E-books, allocated in proportion to the estimated harm. Proposed settlement distributions which apportion available funds according to the relative amount of damages suffered by consumers have repeatedly been deemed fair and reasonable by the Courts. *See In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 733-35 (S.D.N.Y. 1993); *In re Vitamins Antitrust Litig.*, No. 99-1978 (TFH), 2000 U.S. Dist. LEXIS 8931, at *32 (D.D.C. Mar. 30, 2000) (citing *Beecher v. Able*, 575 F.2d 1010, 1013-14 (2d Cir. 1978)); *In re Chicken Antitrust Litig.*, 669 F.2d 228, 240-41 (5th Cir. 1982); *see also* HERBERT B. NEWBERG & ALBA CONTE,

23

NEWBERG ON CLASS ACTIONS § 12.10 (3d ed. 1992) (noting that settlement agreements may provide for *pro rata* distributions based on the fraction of a claimant's loss to the total aggregate recognized loss); FED. JUDICIAL CTR., MANUAL FOR COMPLEX LITIG., 246-48 (3d ed. 1995).[10]

Moreover, all E-book consumers, now and in the future, benefit from the settlement as beneficiaries of the injunctive relief that Settling Publishers have agreed to. *See In re Toys R Us Antitrust Litig.,* 191 F.R.D. 347, 353 (E.D.N.Y 2000) (the toy-consuming public will benefit from the injunctive relief and from the antitrust deterrent inherent in the successful and expeditious conclusion of this litigation). Therefore, Plaintiff States request that this Court preliminarily approve Plaintiff States' proposed Consumer Distribution Plan.

## VI.    THE PROPOSED NOTICE PLAN SHOULD BE APPROVED BY THE COURT

The Plaintiff States also seek this Court's approval of the proposed Consumer Notice Plan attached hereto as *Appendix H.* Consumers in the settling states and territories are entitled to notice of the proposed settlements, and their rights thereunder, including the right to exclude themselves and the opportunity to be heard. *See* 15 U.S.C. § 15c(b)-(c); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002). The mechanics of the notice process, however, are within the discretion of the court subject only to the "broad reasonableness standards imposed by due process." *Handschu v. Special Services Div.*, No. 96 Civ. 1262 (RWS), 1981 U.S. Dist. LEXIS 12283 (S.D.N.Y. April 7, 1980) (internal citations omitted); *In re Prudential Sec. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y. 1996) (quoting *Grunin v. Int'l House of*

---

[10] Plaintiff States' proposal to retain residual funds for future consumer distributions or for *cy pres* purposes, if any exist, after payment of all consumer claims in full, is also fair and reasonable. Indeed, there is significant precedent for court approval of *cy pres* distributions. Courts have validated this method of distribution as "serv[ing] the general public interest, the interests of the plaintiffs and the consumers, and the public interest of disgorgement and deterrence." *New York v. Reebok Int'l Ltd.*, 903 F. Supp. 532, 537 (S.D.N.Y. 1995).

*Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975).  The States' Notice Plan fully comports with the requirements of due process.

### A.    Description of the Notice Plan

The Notice Plan developed for these Settlements will encompass an unprecedented level of direct notice to eligible consumers who purchased E-books from any of the Agency Five publishers from April 1, 2010 to May 21, 2012.  Over the last two months, the States have identified and worked with retailers accounting for approximately 99% of the sales of eligible E-books.  E-books retailers Amazon, Barnes & Noble, Apple, and Kobo have all agreed to identify each customer who is eligible for compensation, and provide direct email notice to those customers within 30 days of the entry of this Court's Order of Preliminary Approval.  These email notices are intended to inform customers clearly about the Settlements, the right to object to or opt out from  the Settlements during a 60-day notice period, the application of an automatic credit to their accounts unless a check is requested, and a link to the Settlement website for more detailed information.  (*Appendix H, Notice Plan, Exhibit A*).

E-Book retailers Google and Sony will similarly identify and send direct notice emails to their customers.  These emails will provide the same information, except for the availability of an automatic credit.[11]  Sony consumers will be informed that checks will automatically be sent to them, while Google customers will be provided with information on how to submit a claim on the Settlement website. (*Appendix H, Notice Plan, Exhibit A*).

Consumers will be able to view or download a detailed "Long Form" notice on the settlement website, which will include common questions and answers. (*Appendix H, Notice Plan,*

---

11 At this time Sony and Google are unable to apply credits to individual accounts, but each is still evaluating possible alternatives.

*Exhibit B*). Consumers will also be able to call a toll-free number maintained by the States'

Claims Administrator to obtain answers to questions or receive mailed copies of the Long Form

notice materials. Included in the Long Form will be comprehensive summaries of the monetary

and injunctive terms of the proposed Settlements, as well as the terms of the releases and

information about the fairness hearing date. The Settlement website will also contain links to the

States' Complaint, the Settlement Agreements, and other court filings. (*Appendix G, Rust*

*Consulting Declaration).*

     Despite the scope of direct email notice, some eligible consumers who made compensable

purchases will not receive direct notice. For example, some retailers may not participate in the

notice program, and some emails from participating retailers may be undeliverable.[12] To reach

these consumers, the States have retained Kinsella Communications Ltd., a company that

specializes in the provision of notice to *parens patriae* and class members through mass media

sources. (*See Appendix I, Kinsella Declaration*). After the Court's grant of preliminary approval

of the Notice Plan, Kinsella will place internet banner advertising that will alert eligible

consumers about the Settlements on numerous online resources such as *Facebook*, *24/7 Network*,

*QuadrantOne*, and *Google Ads*.[13] A summary notice published in the territories will inform

consumers of the proposed Settlements, their right to object, opt out or attend the fairness hearing,

as well as the Claims Administrator's toll-free telephone number and Settlement website address.

(*Appendix H, Notice Plan, Exhibit D*).

---

12 The participating retailers have reported to the states that they have very low "bounce-back" percentages from
mass emails to their customer base, with the highest reported undeliverable rate at 5%. This is not surprising given
the recency of the purchases, and the frequency of the use of computers and the internet among E-book readers.
13 The States and Kinsella will also consult with the Settling Publishers to determine whether the publishers' parent
media companies can offer reduced price or free publication opportunities with equivalent reach, although the
judgment as to whether such opportunities are actually equivalent shall remain the States and their expert notice
provider.

**B.      The Proposed Notice Plan Meets the Requirements of Due Process**

The Plaintiff States believe that the combination of direct email notice and published notice will result in a very high percentage of actual notice to affected consumers, ensuring that the Notice Plan not only meets, but exceeds the mandates of due process. The Notices "fairly, accurately, and neutrally describe the claims and parties in the litigation, the terms of the proposed settlement and the identity of persons entitled to participate in it," as well as apprising affected consumers of their options with regard to the proposed Settlement. *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (citing *Foe v. Cuomo*, 700 F. Supp. 107, 113 (E.D.N.Y. 1988), *aff'd*, 892 F.2d 196 (2d Cir. 1989)). *See also Mullane v. Central Hanover Trust Co.*, 339 U.S. 306 (1950); *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982).

For those few consumers without ascertainable email addresses, notice by paid media has been deemed to suffice under Rule 23(c)(2) and under the due process clause. *See In re Take Two Interactive Secur. Litig.*, No. 06 Civ. 803 (RJS), 2010 U.S. Dist. LEXIS 143837 (S.D.N.Y. June 29, 2010); *Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 325 (E.D. Pa. 1993) (citing *Mullane*, 339 U.S. at 317-18)). In this case, where an unprecedented number of consumers will receive direct notice due to the voluntary cooperation of E-book retailers, the Notice Plan is even more extensive than notice plans used successfully in numerous other class actions and *parens patriae* settlements. *See, e.g., In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000). In fact, the Second Circuit recently noted that the marks of a "more extensive notification campaign" should include the use of electronic media to notify beneficiaries of their settlement rights. *Hecht v. United Collection Bureau, Inc.*, No. 11-1327, 2012 U.S. App. LEXIS 17374, at *17 (2d Cir. Aug. 17, 2012). Therefore, this Court should preliminarily approve the proposed

Notice Plan, and order that Notice be given thirty days after the entry of the Preliminary Approval Order, or as soon thereafter as practicable.

## VII. CONCLUSION

For the foregoing reasons, the Plaintiff States respectfully request that the Court grant preliminary approval of: (1) the Settlement Agreements with Hachette, HarperCollins and Simon & Schuster; (2) the Consumer Distribution and Plan; and (3) the Consumer Notice Plan; and order that notification to eligible consumers may begin within thirty (30) days of the Court's Order.  A proposed Preliminary Approval Order for the Court's consideration is appended hereto at *Appendix J.*

Dated: August 29, 2012

Respectfully submitted,

STATE OF TEXAS
GREG ABBOTT, ATTORNEY GENERAL

DANIEL HODGE
First Assistant Attorney General
JOHN B. SCOTT
Deputy Attorney General for Civil Litigation
JOHN T. PRUD'HOMME
Chief, Consumer Protection Division
KIM VAN WINKLE
Section Chief, Antitrust Section
Consumer Protection Division
GABRIEL R GERVEY
Assistant Attorney General

BY: ___*Rebecca Fisher (RLH)*___
Rebecca Fisher
Senior Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone (512) 463-1265
Rebecca.Fisher@texasattorneygeneral.gov

**ATTORNEYS FOR THE STATE OF TEXAS**
**LIAISON COUNSEL FOR PLAINTIFF STATES**

STATE OF CONNECTICUT
GEORGE JEPSEN, ATTORNEY GENERAL

MICHAEL E. COLE
Chief, Antitrust Department

W. Joseph Nielsen

BY: _Gary Becker (RLH)_

Gary M. Becker (GB8259)
Assistant Attorneys General
55 Elm Street
Hartford, CT 06106
PH: (860) 808-5040
Michael.Cole@ct.gov
Joseph.Nielsen@ct.gov
Gary.Becker@ct.gov

**ATTORNEYS FOR THE STATE OF CONNECTICUT**
**LIAISON COUNSEL FOR PLAINTIFF STATES**

STATE OF OHIO
R. MICHAEL DEWINE,
ATTORNEY GENERAL

BY: _Doreen Johnson (RLH)_

DOREEN JOHNSON
Assistant Chief, Antitrust Section
Edward J. Olszewski
Assistant Attorney General
Office of the Ohio Attorney General, Antitrust
Section
150 E. Gay St. – 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Doreen.Johnson@ohioattorneygeneral.gov

**ATTORNEYS FOR THE STATE OF OHIO**
**LIAISON COUNSEL FOR PLAINTIFF STATES**

STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

BY: _____

Robert L. Hubbard (RH3821)
Linda J. Gargiulo (LG4315)
Assistant Attorney General
Antitrust Bureau
120 Broadway, 26th Floor
New York, NY 10271-0332
(212) 416-8274
robert.hubbard@ag.ny.gov
linda.gargiulo@ag.ny.gov


ATTORNEYS FOR THE STATE OF NEW YORK
LOCAL COUNSEL

## CERTIFICATE OF SERVICE

I the undersigned hereby certify that the Plaintiff States' Memorandum In Support of

Plaintiff States' Motion for Preliminary Approval of Settlements and Proposed Consumer Notice

and Distribution Plans has been served by U.S.P. S. mail on Counsel for Defendants as follows:

**For Defendant HarperCollins Publishers, LLC:**
Clifford H. Aronson
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522

**For Defendant Hachette Book Group, Inc.:**
Walter Stuart
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue
New York, NY 10022

**For Defendants Simon & Schuster, Inc.**
**and Simon & Schuster Digital Sales, Inc.:**
Helene D. Joffe
Alan Kusinitz
Proskauer Rose LLP
Eleven Times Square
New York, NY  10036

Dated: August 29, 2012

Doreen C. Johnson
Assistant Section Chief, Antitrust Section
Ohio Attorney General's Office